UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                          :

SAKIKO FUJIWARA, _et al._,

                     Plaintiffs,

                   -against-

SUSHI YASUDA LTD., _et al._,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

12cv8742

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

In 1938, Congress enacted the Fair Labor Standards Act (FLSA) to guarantee workers "[a] fair day's pay for a fair day's work" and to guard against "the evil of 'overwork' as well as 'underpay.'" Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Roosevelt)).

Recent years have witnessed an explosion in FLSA litigation. FLSA cases constitute nearly 9% of the civil cases filed in the Southern District of New York so far this year. And this district is no outlier. Nationwide, annual FLSA filings are up over 400% from 2001.[1]

A law is only effective to the extent it is enforced, and this increased litigation has been a positive development for many low-wage workers. The same is true for their lawyers. The danger to workers from underpayment by their employers is clear. The danger of overpaying their lawyers is more subtle.

---

[1] 1,961 FLSA cases were filed nationwide in the twelve-month period ending March 31, 2001, compared to 8,126 cases for the twelve-month period ending March 31, 2014. Case filing statistics are available on the Federal Judiciary's website at http://www.uscourts.gov/Statistics.aspx.

When cases settle, "the adversarial process melts away." S.E.C. v. Bear, Stearns & Co., 626 F. Supp. 2d 402, 403 (S.D.N.Y. 2009). Settling defendants tend to lose interest in how settlement monies are distributed. And a natural tension arises between plaintiffs' attorneys and the class they represent, in that both must jockey for payment from a common fund. Often, it is judges alone who are left to safeguard the interests of the class.

Courts typically rely on the adversarial process to strike a balance between competing interests. But the vacuum created by proposed FLSA class action settlements has permitted plaintiffs' attorneys to write much of the law on what constitutes a reasonable attorney's fee. Those fees, effectively paid by the class, at times provide lawyers with more than a fair day's pay for a fair day's work.

As is often the case, Plaintiffs in this FLSA and New York Labor Law (NYLL) action move, unopposed, for final approval of a class settlement. Their lawyers have expertly guided the case to this point and obtained an excellent settlement for the class. For the following reasons, Plaintiffs' motion for final approval is granted, but the requested attorney's fees are reduced and the application for service awards for Class Representatives is denied.

## BACKGROUND

In 2011, Eric Asimov, the chief wine critic for the New York Times, wrote that Sushi Yasuda, "with its devotion to sushi in its purist form, unalloyed with other Japanese cuisines or American twists, . . . occupies a singular position in New York's sushi landscape." Eric Asimov, Quiet Please: Sushi Being Served, N.Y. Times, Nov. 16, 2011 at D8. He noted the restaurant "excelled back in 2000, and . . . continues to meet its high standards." But even three-star restaurants are not immune to wage and hour claims.

Plaintiffs Sakiko Fujiwawra, Mayumi Imoto, and Satoko Nagai ("Named Plaintiffs") filed this action in December 2012 against Sushi Yasuda and its owners.[2]  The Named Plaintiffs were current and former wait staff of Sushi Yasuda.  They alleged that wait staff, bussers, and sushi chefs were not paid minimum wage during their training period, premiums for overtime work, spread of hours premiums for days in which they worked over ten hours or a split shift, or the gratuities left by customers.  Haruko Fujimoto, Kana Harayama, and Kiyoe Takada (together with the Named Plaintiffs, "Class Representatives") joined the suit as FLSA opt-in plaintiffs shortly thereafter.

Not long after this suit was filed, Sushi Yasuda made a well-publicized decision to raise its prices and eliminate tipping.  See Patrick McGeehan, Tip 15, 20 or 25 Percent? Here, They Strongly Suggest Zero, N.Y. Times, June 6, 2013, at A21.  While most of the reportage emphasized the restaurant's desire to follow Japanese customs and create a more pleasant customer experience, it appears this lawsuit may also have prompted the move.  See Ryan Sutton, NYC's Sushi Yasuda Eliminates Tipping. Gratuities No Long Accepted (Updated) [sic], The Price Hike, http://thepricehike.com/post/52308734397/nycs-sushi-yasuda-eliminates-tipping-gratuities-no (noting Sushi Yasuda's owner stated "[t]he laws around tipping and how they're divided get really convoluted and there aren't really clear guidelines on how to tally it up.").

After taking initial discovery, Plaintiffs moved for class certification of their NYLL claims in September 2013.  Before Sushi Yasuda filed any opposition, the parties entered

---

[2] Individual Defendants Naomichi Yasuda and Ichitaro Kono were never served, but the claims against them are released by this settlement.

mediation and settled in principle.  They finalized the settlement in April 2014, and this Court

authorized notice to the class on May 14, 2014.

I.   The Settlement

Defendants are paying $2.4 million to settle the case on a classwide basis.[3]  They

are joining Plaintiffs' motion to certify a class consisting of all persons who worked 90 days or

more at Sushi Yasuda between December 3, 2006 and May 12, 2013 as sushi chefs, bussers,

and/or wait staff.  The parties originally proposed the $2.4 million settlement be distributed as

follows:

1.   $20,000 service awards to each of the six Class Representatives;

2.   $800,000 in fees and costs to Plaintiffs' counsel;

3.   $100,000 to create an Administration & Errors fund; and

4.   The remainder ("Net Settlement Fund") to be distributed among class members.

After this Court questioned the magnitude of the proposed attorney's fees award

at the fairness hearing, Plaintiffs' counsel reduced their request to $600,000.  (ECF No. 52.)  The

portion to be distributed to the class is to be allocated pro rata based on the number of shifts

worked by class members during the class period.  For example, if the entire class worked a total

of 100 shifts during the class period, and a class member worked 10 of those shifts, she would be

entitled to one-tenth of the Net Settlement Fund.  The number of shifts worked by Class

Representatives is to be increased by 50% in calculating their awards.

If a distribution check goes uncashed for six months, the settlement provides for

funds to be allocated as follows:

---

[3] The settlement agreement is available at ECF No. 49-1.

1. Uncashed payments to Class Representatives will revert to Defendants;

2. Uncashed payments to class members who worked as sushi chefs will revert to Defendants; and

3. Half of any uncashed payments to any other class member will revert to Defendants, with the other half redistributed to participating class members on a pro rata basis, provided that no class member will receive more than 175% of his or her original share.

This Court reserves the right to modify this plan and will require the parties to file a report on the status of class payments and seek this Court's approval before any uncashed funds revert to Defendants.

The Administration & Errors fund will cover any errors or omissions in distributing the settlement, and any amount remaining in the fund will be redistributed to participating class members. Defendants or the settlement administrator will report each settlement payment to the IRS and make appropriate withholdings.

II.   Notice and Participation

Defendants' counsel provided the settlement administrator with a mailing list and contact information for all 87 class members. After locating updated contact information for some class members, all but 10 received notice packets.

One class member opted out of the settlement. None have objected. Sixty-eight class members have responded and are eligible to receive payments.

III.   Final Approval

a.   Legal Standard

There is a "strong judicial policy in favor of settlements, particularly in the class action context." In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998). Claims in a certified class action may be settled only with the court's approval "after a hearing

-5-

and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

This requires consideration of the "negotiating process leading up to the settlement, i.e.,

procedural fairness, as well as the settlement's substantive terms, i.e., substantive fairness."

McReynolds v. Richards–Cantave, 588 F.3d 790, 803–04 (2d Cir. 2009) (quoting D'Amato v.

Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001)).

A "presumption of fairness, adequacy, and reasonableness may attach to a class

settlement reached in arm's-length negotiations between experienced, capable counsel after

meaningful discovery." Wal-Mart Stores, Inc. v. Visa U.S.A., 396 F.3d 96, 116 (2d Cir. 2005).

All counsel here are experienced and capable. The parties here engaged in sufficient discovery

to inform their negotiations, which were adversarial and at arm's length. (Decl. of Brent E.

Pelton ¶¶ 11–21 (ECF No. 45).) The settlement is procedurally reasonable and entitled to a

presumption of fairness.

At the final approval stage, courts determine whether a settlement is substantively

fair by comparing "the terms of the compromise with the likely rewards of litigation." Maywalt

v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1079 (2d Cir. 1995) (quoting Weinberger v.

Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)). Courts in this circuit typically consider the nine

Grinnell factors:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; (9) the range of reasonableness of the settlement
> fund to a possible recovery in light of all the attendant risks of
> litigation.

City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000) (internal citations omitted).

          b.   *Grinnell* Factors

          Wage and hour cases are not unduly complex.[4] As discussed below in connection with counsel's fees, even if the area of law is straightforward, class actions are complex. This alone is not relevant because every settlement considered under the Grinnell factors is a class action. But at the time of settlement, Plaintiffs had moved for class certification and Defendants had yet to respond. Litigating that motion, and assuming it would have been successful, continuing with extensive fact and expert discovery and ultimately trial would have entailed significant costs and taken considerable time.

          The reaction to the settlement has been favorable. As stated, there has been only one opt-out and no objections. "The fact that the vast majority of class members neither objected nor opted out is a strong indication that the proposed settlement is fair, reasonable, and adequate." Wright v. Stern, 553 F. Supp. 2d 337, 345 (S.D.N.Y. 2008).

          In evaluating the stage of the case and the discovery taken, courts attempt to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 537 (3d Cir. 2004). Nine depositions were conducted in this case, and document discovery including payroll records, work schedules, and employee files was produced. Counsel were sufficiently aware of the merits of the case to intelligently negotiate a meaningful settlement.

---

[4] In 1981 the Supreme Court noted that "FLSA claims typically involve complex mixed questions of fact and law." Barrentine v. Ark.-Best Freight Sys., Inc., 450 U.S. 728, 743 (1981). But the Court was discussing how non-lawyer arbitrators might be poorly equipped to decide legal issues in FLSA cases. This Court does not read the decision to say that the FLSA is a particularly complex area of law.

The risk of failing to establish liability was relatively small.  But Plaintiffs faced risks in establishing their damages.  While Sushi Yasuda did not pay class members the gratuities left by customers, it did pay them a comfortable hourly wage, well above the tip credit minimum wage many restaurants offer.  The fact that class members were well compensated clouded the damages calculation.

Establishing a class and maintaining it through trial would likely not have been difficult.  The parties settled this case before Defendants opposed the class certification motion, so this Court has not seen the arguments they would have raised.  But given what appear to have been universally applicable pay policies at the restaurant, it seems likely Plaintiffs would have established and maintained a class.

The record does not reflect whether Defendants could withstand a larger judgment.  But while an ability to withstand a larger judgment might require disallowance of an inadequate settlement, a defendant's financial position is largely irrelevant when the settlement is ample.  See In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d 164, 178 n.9 (S.D.N.Y. 2000), aff'd sub nom. D'Amato v. Deutsche Bank, 236 F.3d 78 (2d Cir. 2001) ("[D]efendants' ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair.").

Finally, the settlement fund is within the range of reasonableness, both with respect to the best possible recovery and the risks attendant to litigation.  Of course, Plaintiffs predict it would have been possible to obtain a larger judgment at trial.  But this factor requires analyzing whether the settlement is within "a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  Frank v. Eastman Kodak Co., 228 F.R.D. 174, 186 (W.D.N.Y.

2005) (quoting <u>Newman v. Stein</u>, 464 F.2d 689, 693 (2d Cir. 1972)).  A $2.4 million settlement is a very good outcome for the class.

      The <u>Grinnell</u> factors weigh decisively in favor of the settlement, and the settlement is entitled to final approval.

      c.  <u>Confidentiality Agreement</u>

      The settlement agreement provides that the Named Plaintiffs and their counsel "shall keep strictly confidential the existence and terms" of the settlement, except for communications with class members and agreed-upon references on counsel's website. (Settlement Agreement at 35 (ECF No. 49-1).)  This language does not appear to bind absent class members, but the settlement indicates it might, because it states that "this paragraph does not prohibit the Settlement Class Members from disclosing information concerning this Settlement Agreement to members of their immediate family or life partners" and permits class members to "disclose information concerning this Settlement Agreement to their respective counsel, tax advisors, insurance companies, and external auditors who have first agreed to keep said information confidential."  (Settlement Agreement at 36.)

      Nondisclosure agreements in FLSA settlements contravene public policy.  <u>See</u> <u>Guareno v. Vincent Perito, Inc.</u>, 2014 WL 4953746, at *1 (S.D.N.Y. Sept. 26, 2014).  And this is especially true if they arguably apply to absent class members, who did not agree to such a provision and could find themselves in violation of an agreement they did not know existed. Class counsel may agree to not publicize the settlement, but Plaintiffs and class members cannot be required to keep silent.

d. Service Awards

The settlement provides the six Class Representatives with service awards of $20,000 each. "Payments to class representatives, while not foreclosed, should be closely scrutinized." Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007). Service awards may be appropriate where a plaintiff took on considerable risk in bringing the suit. See In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110, 131 (S.D.N.Y. 2009) (named plaintiff faced "substantial personal risk"); Roberts v. Texaco, Inc., 979 F. Supp. 185, 200–05 (S.D.N.Y. 1997) (plaintiffs faced substantial risk of workplace retaliation). Payments may also be appropriate to compensate lost wages, vacation time, or out of pocket expenses suffered by a plaintiff as a result of aiding in the prosecution of a class action. See Varljen v. H.J. Meyers & Co., 2000 WL 1683656, at *5 n.2 (S.D.N.Y. Nov. 8, 2000).

But "[a]bsent class members are entitled to repose confidence and trust in a class representative to pursue claims with diligence and refrain from proposing a settlement which is unreasonably low. This confidence derives in large measure from knowing that the class representative stands in the same shoes as all other members of the class." Silberblatt, 524 F. Supp. 2d at 435. "If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720 (E.D.N.Y. 1989). "[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised." Women's Comm. for Equal Employment Opportunity (WC=EO) v. Nat'l Broadcasting Co., 76 F.R.D. 173, 180 (S.D.N.Y. 1977).

Here, the Class Representatives assisted class counsel in drafting pleadings by providing information about their job duties and the hours they worked. They executed declarations, produced documents, and communicated with other class members, but these are the routine duties of class representatives. Five of the Class Representatives sat for seven-hour depositions, and all put their reputations at risk and jeopardized their relationships with their employer, a restaurant which Plaintiffs' counsel described as having very loyal employees. And this Court is mindful of class counsel's argument that the Japanese are more litigation averse than Americans and therefore Plaintiffs faced greater opprobrium for bringing this suit than might typically be the case.

The time spent sitting for depositions merits a service award, and the risk may as well. But each Class Representative is already receiving what amounts to a backdoor service award because the plan of allocation calls for the number of shifts worked by Class Representatives to be increased by 50%, thereby increasing their share of the settlement. This adequately compensates the Class Representatives for their time and whatever risk they faced in this suit without the need for a separate award.

   e.  <u>Attorney's Fees</u>

A court may calculate a reasonable attorney's fee either by determining the lodestar amount or by awarding a percentage of the settlement. <u>In re Currency Conversion</u>, 263 F.R.D. at 128. The overwhelming trend, however, is to award a percentage of the fund. <u>See In re WorldCom, Inc. ERISA Litig.</u>, 2005 WL 3101769, at *7 (S.D.N.Y. Nov. 21, 2005). In addition to being far simpler, awarding a percentage of the fund aligns the interest of the class and their counsel by encouraging counsel to resolve cases at an early stage, if possible, while still obtaining the largest possible recovery. <u>WorldCom</u>, 2005 WL 3101769, at *7.

-11-

In awarding a percentage of the fund, a court considers: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 50 (2d Cir. 2000). And the lodestar calculation is used as a "'cross check' on the reasonableness of the requested percentage." Goldberger, 209 F.3d at 50.

Counsel worked diligently and settled the matter promptly. To their credit, class counsel did not expend an extraordinary amount of time and labor on this case. There was no motion to dismiss. Plaintiffs' counsel conducted discovery and moved for class certification, but settlement talks began in earnest thereafter, and the matter settled before an opposition brief was filed. The parties reached an agreement in principle a year after the complaint was filed. Plaintiffs' counsel has submitted a table showing that all told, they billed fewer than 650 hours on the matter, including paralegal time. (Pelton Decl. Ex. 3 (ECF No. 49-2).)

A request for class certification adds complexity to a wage and hour case. In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d at 174. Class counsel's perceived ability to obtain class certification and guide the class through litigation to trial undoubtedly affected Defendants' willingness to settle. The moderate complexity of this case militates toward a favorable fee award for class counsel.

This does not appear to have been a particularly risky litigation. In most cases, obligations under the FLSA and NYLL are relatively clear and liability turns on factual issues. There was no dispute here that the Defendants did not pay Plaintiffs the gratuities left by customers. And while class certification is never certain, it would likely not have been difficult

to certify a class of employees working the same positions as the Class Representatives at a single restaurant location in a suit challenging a uniform pay policy.

The quality of representation was unquestionably high. The lead attorney for Plaintiffs has twelve years of experience in wage cases and is an accomplished attorney in the field. (Pelton Decl. ¶ 23.) In both their submissions and appearances before this Court, class counsel has acted professionally and competently.

Class counsel originally requested one-third of the settlement fund—$800,000—as its fee. After questioning from this Court at the final approval hearing, counsel sent a letter stating that although they continued to believe one-third of the settlement was fair, they would reduce their fee application to one-quarter of the settlement—$600,000. (ECF No. 52). Their submissions correctly note that courts often award one-third of a settlement fund as reasonable fees. See, e.g., Toure v. Amerigroup Corp., 2012 WL 3240461 (E.D.N.Y. Aug. 6, 2012); Willix v. Healthfirst, Inc., 2011 WL 754862, at *6 (E.D.N.Y. Feb. 18, 2011); deMunecas v. Bold Food, LLC, 2010 WL 3322580, at *8 (S.D.N.Y. Aug. 23, 2010); Clark v. Ecolab Inc., 2010 WL 1948198, at *8 (S.D.N.Y. May 11, 2010).

However, there is reason to be wary of much of the caselaw awarding attorney's fees in FLSA cases in this circuit. Struck by extreme similarities in the wording of several decisions, this Court discovered that many of the authorities cited by Plaintiffs' counsel in support of their fee application are in fact proposed orders drafted by the class action plaintiffs' bar and entered with minimal, if any, edits by judges. Indeed, each of the four decisions mentioned above, the same authorities Plaintiffs cited in their brief, were proposed orders making findings of fact and conclusions of law drafted by plaintiffs' counsel requesting their own fees.

Often, fee applications are unopposed.  Defendants have little concern for what portion of the settlement goes to plaintiffs' counsel.  And unlike a securities class action, where the class likely contains sophisticated investors, most FLSA class members are not in a position to object.  Those best suited to dispute the fees—the class representatives—would be forced to oppose their own lawyers and in any event are often placated with outsized service awards.  The risks presented by class action settlement—and the need for judicial scrutiny—have long been recognized.  See generally Thorogood v. Sears, Roebuck & Co., 547 F.3d 742, 744–45 (7th Cir. 2008); Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chi., 834 F.2d 677, 681 (7th Cir. 1987); Saylor v. Lindsley, 456 F.2d 896, 900–01 (2d Cir. 1972) (Friendly, J.); Susan P. Koniak & George M. Cohen, Under Cloak of Settlement, 82 Va. L. Rev. 1051 (1996); Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action & Derivative Litigation: Economic Analysis & Recommendations for Reform, 58 U. Chi. L. Rev. 1, 22–26 (1991).

Proposed orders are a convenient way of managing congested dockets, and proposed orders approving unopposed class settlements are particularly attractive to judges in that they clear large cases from the docket in a situation where the likelihood of scrutiny from the Court of Appeals is remote.  But unlike individual actions, a class action settlement, if approved, is an adjudication of the matter as to the absent class members, who neither negotiated nor agreed to the settlement.  To them, it is not a settlement at all.  Approval of class action settlements and fee applications is precisely where judicial scrutiny, not judicial deference, is most needed.

Orders drafted by counsel, especially those making findings of fact and conclusions of law that award counsel their own fees, should be given little precedential value.

-14-

By submitting proposed orders masquerading as judicial opinions, and then citing to them in fee applications, the class action bar is in fact creating its own caselaw on the fees it is entitled to. Because Westlaw and Lexis sweep every order of any significance into their databases, these form orders appear as if they were decisions by the judges who signed them.  No wonder that "caselaw" is so generous to plaintiffs' attorneys.

        The mischief attendant to publishing proposed orders as judicial opinions is more vexing.  Judges have wide latitude in deciding what to publish.  But decisions of district judges are merely persuasive authority, not binding precedent, and publication should be the exception. Federal Judicial Center, <u>Judicial Writing Manual: A Pocket Guide for Judges</u> (2d ed.) at 7 (2013).  A published opinion should signal "a novel or complex issue or a matter of public importance and thus may be useful to attorneys and judges or be of interest to the public." <u>Judicial Writing Manual</u> at 7.  It is therefore particularly distressing when proposed orders drafted by Plaintiffs' counsel migrate into the <u>Federal Supplement</u> or <u>Federal Rules Decisions</u> as published opinions.  Judges might heed the advice the Judicial Conference of the United States gave in 1964 and publish "only those opinions which are of general precedential value."  <u>See</u> Donald R. Songer, <u>Nonpublication of the United States District Courts: Official Criteria Versus Inferences from Appellate Review</u>, 50 J. Politics 206, 206 (1988).

        In this case, the lodestar cross check readily demonstrates why counsel's original request of $800,000 would be an oversized award.  This would result in an effective hourly rate of over $1,200 for every attorney and paralegal who worked on this case—a rate commanded by very few attorneys in this city, and deserved by even fewer.  At counsel's stated hourly rates, they would have billed approximately $275,000 in this matter, resulting in a requested multiplier of 2.8.

But, here too, there is reason to be cautious.  Lead counsel Brent Pelton states his hourly rate is $550.  Another attorney, of counsel to Pelton & Associates, worked 11 hours at a rate of $650.  Pelton's associates' stated rates range from $275 to $350, and their support staff rates range from $150 to $185.  (Pelton Decl. Ex. 3.)  Because all of these attorneys work entirely on contingency, these rates are untested by the marketplace.  (Aug. 1, 2014 Tr. 9:25-10:5.)  When no client pays by the hour, it is an easy matter to reduce a lodestar multiplier by increasing your "rate."  In 2012, a magistrate judge in the Eastern District of New York found that Pelton's stated rate, $425 at that time, to be higher than the rates typically seen in that district for wage and hour cases.  See Monserrate v. Tequipment, Inc., 2012 WL 5830557, at *2 (E.D.N.Y. Nov. 16, 2012).

"Courts in this District have determined in recent cases that a fee ranging from $250 to $450 is appropriate for experienced litigators in wage-and-hour cases."  Yuquilema v. Manhattan's Hero Corp., 2014 WL 4207106, at *14 (S.D.N.Y. Aug. 20, 2014); see also Monserrate, 2012 WL 5830557, at *2 (typical partner rates in wage and hour cases in 2012 were $200–400).  The most experienced of Pelton's associates graduated from law school in 2009.  Reasonable rates in wage cases for associates with considerably more experience fall in the $250–300 range.  See Yuquilema, 2014 WL 4207106, at *14 (reducing rate for 2005 graduate to $300); Galeana v. Lemongrass on Broadway Corp., --- F. Supp. 2d ----, 2014 WL 1364493, at *21 (S.D.N.Y. Apr. 4, 2014) (awarding $250 to 2006 graduate); but see Monserrate, 2012 WL 5830557, at *2 (typical associate rates in 2012 were $100–150).  If time in this matter were billed at $450 for partners, the top associate rate were reduced to $250, and the support staff rates were reduced to $100, counsel's lodestar would be $210,805, and an $800,000 fee award would represent a 3.8 multiplier.

-16-

Plaintiffs argue that "[c]ourts regularly award lodestar multipliers of up to eight times lodestar, and in some cases, even higher multipliers." (Pls.' Br. at 23.) This exact sentence, with the same case citations in support of it, has made its way into many court "decisions" in this circuit via proposed orders drafted by plaintiffs' attorneys. See, e.g., Aboud v. Charles Schwab & Co., 2014 WL 5794655, at *5 (S.D.N.Y. Nov. 4, 2014); Zeltser v. Merrill Lynch & Co., 2014 WL 4816134, at *9 (S.D.N.Y. Sept. 23, 2014); Clem v. Keybank, N.A., 2014 WL 2895918, at *9 (S.D.N.Y. June 20, 2014); In re Penthouse Executive Club Compensation Litigation, 2014 WL 185628, at *10 (S.D.N.Y. Jan. 14, 2014); Yuzary v. HSBC Bank USA, N.A., 2013 WL 5492998, at *10 (S.D.N.Y. Oct. 2, 2013); Beckman v. Keybank, N.A., 293 F.R.D. 467, 481 (S.D.N.Y. 2013); Hernandez v. Merrill Lynch & Co., 2013 WL 1209563, at *9 (S.D.N.Y. Mar. 21, 2013); Morris v. Affinity Health Plan, Inc., 859 F. Supp. 2d 611, 623 (S.D.N.Y. 2012); Matheson v. T-Bone Restaurant, LLC, 2011 WL 6268216, at *8 (S.D.N.Y. Dec. 13, 2011).

But the cases cited in Plaintiffs' brief and those decisions in support of this proposition provide weak support for such lofty multipliers. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1052–54 (9th Cir. 2002), surveyed class action settlements, and while it did find some outliers, the opinion notes that 83% of the settlements it surveyed had multipliers within the 1.0– 4.0 range. Vizcaino, 290 F.3d at 1051 n.6. In Ramirez v. Lovin' Oven Catering Suffolk, Inc., 2012 WL 651640, at *4 (S.D.N.Y. Feb. 24, 2014), cited as an example of a court awarding a 6.8 multiplier, the opinion does not calculate the multiplier or even provide information sufficient to calculate it. Plaintiffs' counsel attests that by reviewing the submissions to the court they were able to determine the multiplier, but that is hardly a worthy precedent on the issue.

There is little consensus in this district on the appropriate range for lodestar multipliers. One court found that "[i]n recent years multipliers of between 3 and 4.5 have become common" and described 2.09 as "at the lower end of the range of multipliers awarded by courts within the Second Circuit." In re Lloyd's Am. Trust Fund Litig., 2002 WL 31663577, at *27 (S.D.N.Y. Nov. 26, 2002); see also Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (finding multiplier of 4.65 "well within the range awarded by courts in this Circuit and courts throughout the country"). This Court has held that "[a]s a rule, post-Goldberger courts . . . have generally refused multipliers as high as 2.03." In re Currency Conversion, 263 F.R.D. at 129 (quoting In re Merrill Lynch & Co. Research Reports Sec. Litig., 2007 WL 4526593, at *21 (S.D.N.Y. Dec. 20, 2007)); see also Tiro v. Public House Investments, LLC, 2013 WL 4830949, at *15 (S.D.N.Y. Sept. 10, 2013) (awarding multiplier of 1 and noting "[t]his court is not one that routinely authorizes settlements at six, seven and eight times lodestar. . . . [I]f the lodestar is significantly out of line with the percentage of recovery it raises a red flag."); Silverstein v. AllianceBernstein, L.P., 2013 WL 7122612 (S.D.N.Y. Dec. 20, 2013) (awarding one-third of settlement fund with no multiplier in wage class action). And several courts have awarded only a fraction of the lodestar amount (confusingly referred to as a "negative lodestar") when the lodestar is a high proportion of the settlement fund. See, e.g., Fears v. Wilhelmina Model Agency, 2009 WL 2958396, at *8 (S.D.N.Y. Sept. 16, 2009); In re NTL, Inc. Sec. Litig., 2007 WL 623808, at *8 (S.D.N.Y. Mar. 1, 2007); Beane v. Bank of N.Y. Mellon, 2009 WL 874046, at *8 (S.D.N.Y. Mar. 31, 2009); Silberblatt v. Morgan Stanley, 542 F. Supp. 2d 425, 434 (S.D.N.Y. 2007). The lodestar is worthless as a "cross check" on the percentage recovery method when there is so little agreement as to what constitutes a reasonable

multiplier.  Guidance from the Court of Appeals would be welcome, but of course there is rarely an appeal from a decision such as this.

The fact that counsel here worked on contingency clearly entitles them to some premium for the risk incurred.  "No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.  Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended."  Grinnell Corp., 495 F.2d at 470 (quoting Cherner v. Transitron Elec. Corp., 221 F. Supp. 55, 61 (D. Mass. 1963)).  But "unless time spent and skill displayed be used as a constant check on applications for fees there is a grave danger that the bar and bench will be brought into disrepute, and there will be prejudice to those whose substantive interests are at stake and who are unrepresented except by the very lawyers who are seeking compensation."  Grinnell Corp., 495 F.2d at 470–71 (quoting Cherner, 221 F. Supp. at 61).  In this Court's opinion, a multiplier near 2 should, in most cases, be sufficient compensation for the risk associated with contingent fees in FLSA cases.  The plaintiffs' bar is presumably selective enough with the cases they take on to win a recovery in at least half of them.  A multiplier near 2 compensates them appropriately.  Cf. Trinidad v. Pret a Manger (USA) Ltd., 2014 WL 4670870, at *12 (S.D.N.Y. Sept. 19, 2014) (multiplier of 1.82 gives class counsel "ample credit for the effort and risk" in FLSA and NYLL class action).

Applying these principles to the case at hand, 20% of the fund is a reasonable attorney's fee.  This amounts to $480,000, which is 2.28 multiplier from the modified lodestar calculation above and a 1.75 multiplier from class counsel's stated hourly rates.  In addition, class counsel incurred $20,020.18 in costs, primarily from mediation expenses. (Pelton Decl.

Ex. 3.)  Counsel are entitled to recover reasonable out-of-pocket expenses in a fee award.  See

LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998).  This Court will separately

award counsel's costs in addition to their fees, for a total award of $500,020.18.

CONCLUSION

For the foregoing reasons, this Court grants final approval of the settlement.  The

parties are directed to modify the Settlement Agreement to remove confidentiality requirements

that apply to Class Representatives and class members.  The request for service awards to Class

Representatives beyond the enhancement to their number of shifts worked in the plan of

allocation is denied.  Class counsel fees and costs in the amount of $500,020.18 are approved.

The parties are directed to submit a proposed final judgment in accord with this memorandum

and order.  They are further directed to file a report on the status of the settlement before any

payments revert to Defendants.

Dated: November 12, 2014
       New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Brent E. Pelton, Esq.
Taylor B. Graham, Esq.
Pelton & Associates, P.C.
111 Broadway, Suite 901
New York, NY 10000
*Counsel for Plaintiffs*

Anna Kolontyrsky, Esq.
Christopher A. Parlo, Esq.
Melissa C. Rodriguez, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178

Vincent E. Bauer, Esq.
Law Offices of Vincent E. Bauer
516 Fifth Avenue, 12th floor
New York, NY 10036
*Counsel for Defendants*